THE BOARD OF EDUCATION OF THE CITY OF ENGLE-
WOOD, PLAINTIFF-RESPONDENT, v. ENGLEWOOD
TEACHERS ASSOCIATION, DEFENDANT-APPELLANT.

Reargued September 11, 1973—Decided November 20, 1973.

(1)

*Mr. Theodore M. Simon* argued the cause for the defendant-appellant.

*Mr. Sidney Dincin* argued the cause for the plaintiff-respondent.

The opinion of the Court was delivered by

JACOBS, J.  The plaintiff Board of Education of Englewood filed complaints in the Chancery Division seeking to restrain the defendant Englewood Teachers Association from proceeding to arbitration of alleged grievances under the agreement between them for the 1971–73 school years.  Answers were filed along with a counterclaim which is not now before us.  The Chancery Division entered judgments of restraint and the defendant appealed to the Appellate Division.  We certified before argument there and heard the matters along with *Dunellen Board of Education v. Dunellen Education Association*, 64 *N. J.* 17 (1973) which was decided today.

Pursuant to *N. J. S. A.* 34:13A–1 *et seq.* the Englewood Board entered into a written agreement with the Englewood Teachers Association as the recognized representative of the teachers and other personnel in the Englewood school system.  The agreement contained numerous provisions but only those which relate to the several matters at hand and are relied on by the parties need be dealt with here.  One of the matters involved four special education teachers who were employed by the Board to teach trainable, retarded children at the Engle Street School.  Their customary working hours were from 8:45 A.M. to 1:30 P.M. whereas the customary working hours of teachers of non-handicapped children were from 8:45 A.M. to 3:15 P.M.  The official school hours for students were from 9 A.M. to 3 P.M. and the agreement set forth, in Article VII captioned "Teaching Goals and Conditions," that "teachers are expected to be in the school building fifteen minutes before the official arrival time of students at the beginning of the school day and to remain in the school building at the end of such day fifteen minutes after the students have been dismissed."  The agreement made no mention of the special education teachers but it contained, in

Article XXX captioned "Miscellaneous Provisions," a general "Savings Clause" which set forth in part that "unless otherwise provided in this Agreement, nothing contained herein shall be interpreted and/or applied so as to eliminate, reduce nor otherwise detract from any teacher benefit existing prior to its effective date."

During the term of the agreement the Board unilaterally changed the hours of employment of the four special education teachers to conform with the longer hours of the other teachers. Their working hours were thus lengthened without any additional compensation. They contended that this violated the agreement and the Association, acting on their behalf, pursued the four level internal grievance procedures provided for in the agreement. Being dissatisfied with the internal disposition of the grievance, the Association sought arbitration under Article III which provided that either party could request a list of arbitrators from the American Arbitration Association and that both the Board and the Teachers Association would then be bound by the Arbitration Association's rules and procedures in the selection of an arbitrator. The agreement provided that "as to those grievances which involve decision of the meaning or interpretation of the language of this agreement, the arbitrator's decision shall be final and binding on the parties." It further provided that as to all other grievances the arbitrator's decision shall be advisory only and that "In deciding grievances, the arbitrator shall be without power or authority to make any decision contrary to, or inconsistent with, or modifying or varying in any way, the terms of this Agreement or of applicable law or rules or regulations having the force and effect of law involving Board discretion or policy under its rules and regulations which survive this Agreement; or limiting or interfering in any way with the powers, duties and responsibilities of the Board under applicable law."

The Association's position was that the savings clause should be interpreted as having been intended to protect

teachers, including the special education teachers, against such unilateral extensions of their preexisting working hours and it sought a binding arbitrator's decision to that effect. The Board's position, as set forth in its Chancery Division complaint, was that the matter was "not arbitrable because it involves the hours of work of teachers" which the Board alone may decide and which decision it may not delegate in view of the terms of the education laws (Title 18A). The Chancery Division concluded that the matter was not arbitrable and entered a judgment restraining the Teachers Association from proceeding with the proposed arbitration before the American Arbitration Association. Before us the parties have agreed that the issue of arbitrability is now properly before the Court for its adjudication. The Association contends that the agreement, insofar as it bore on hours, clearly related to "the terms and conditions of employment" within the contemplation of $N. J. S. A.$ 34:13A–5.3 and that its meaning or interpretation was clearly a proper subject for binding arbitration within the grievance procedures. On the other hand, the Board contends that the school laws precluded such arbitration and that, in any event, the dispute between the parties was one within the exclusive jurisdiction of the Commissioner of Education for his determination under $N. J. S. A.$ 18A:6–9.

In addition to the foregoing there were two other grievances which related not to hours of employment but to compensation or salary. The agreement embodied Article XIV captioned "Professional Development Program." That article set forth that the purpose of the program was to encourage teachers to pursue further studies. A teacher could make application for 50% tuition reimbursement which would be reviewed by a committee and forwarded, with its recommendation, to the Superintendent for final action. Mr. Brodsky applied for reimbursement for two courses which he completed, one in "Community Analysis" and the other in "School Business Administration." His application was denied but after the As-

sociation filed a grievance on his behalf, his application was reconsidered and he was reimbursed for one course but not the other. The internal grievance procedures having been exhausted, the Association sought arbitration, contending that the denial of reimbursement for one of the courses violated the terms of the agreement between the Board and the Association.

The final grievance concerned Mr. Brodsky and the interpretation of the Teacher Salary Guide 1971–1972 which was embodied as an appendix in Article IX captioned "Teachers' Compensation." The schedule of compensation was based, in part, on formal levels of training under the headings, "Bachelor", "Masters" and "M.A. + 30." The agreement contained no definitions of the quoted headings. Mr. Brodsky applied for placement on the M.A. + 30 level but his application was denied. The Association filed a grievance on his behalf and, after unsuccessfully pursuing the internal grievance procedures, sought arbitration contending that on a proper interpretation of the agreement, Mr. Brodsky was entitled to be placed on the level he sought and that the matter was a proper subject for binding arbitration. Although the record before us is obscure, it may well be that the refusal to place Mr. Brodsky on the requested level was based on the Board's rejection of the course for which he was denied reimbursement. In any event, the Chancery Division ruled that neither the refusal to place Mr. Brodsky on the requested level nor the denial of reimbursement was an arbitrable matter and that consequently the Board was entitled to the restraints it sought.

The general principles aimed at reconciling the provisions of the Education Law and the Employer-Employee Relations Act are dealt with in *Dunellen Board of Education v. Dunellen Education Association, supra.* Under the principles there set forth it is clear to us that the restraints below were entered erroneously. Surely working hours and compensation are terms and conditions of employment within

the contemplation of the Employer-Employee Relations Act. Those matters along with physical arrangements and facilities and customary fringe benefits would appear to be the items most evidently in the legislative mind. It is undisputed that the Board could not agree on hours or compensation in violation of specific terms of the education laws or in violation of specific departmental rules or regulations; indeed this is expressly recognized in the arbitration clause itself. Where the Legislature sets forth minimum schedules of compensation (*N. J. S. A.* 18A:29–7; *N. J. S. A.* 18A:29–12) and minimum increments (*N. J. S. A.* 18A:29–8; *N. J. S. A.* 18A:29–12), the Board may not go below but may go above. Similarly it may not depart from any statutes or regulations which fix hours though it may go above prescribed minimums. *Cf. N. J. A. C.* 6:3–1.13. Nothing has been presented to us which indicates that the contractual interpretations sought by the Association, if accepted by the arbitrator, would violate any statutes or regulations dealing with teachers' working hours or compensation.

The Board stresses its management duty under provisions such as *N. J. S. A.* 18A:11–1 and *N. J. S. A.* 18A:27–4 to conduct the public school system but it also has the duty under *N. J. S. A.* 34:13A–5.3 to negotiate in good faith with respect to employment terms and conditions. As was pointed out in *Dunellen, supra,* major educational policies which indirectly affect the working conditions of the teachers remain exclusively with the Board and are not negotiable whereas items which are not predominantly educational policies and directly affect the financial and personal welfare of the teachers do not remain exclusively with the Board and are negotiable. The lines are obscure and, pending further definitive legislation, they must be drawn case by case. In *Dunellen, supra,* the subject of consolidation was one for the Board alone; here the hours and compensation of the individual grievant teachers were suitable for negotiation and grievance procedures including ultimate arbitra-

tion as provided for in the Englewood agreement. *Cf.* Edwards, "The Emerging Duty to Bargain in the Public Sector," 71 *Mich. L. Rev.* 885, 919–20 (1973):

> Public eduaction provides an excellent environment for the development of the case-by-case method of defining the scope of bargaining. Such matters as the length of the school ;day, the academic calendar, classroom size, and extra-curricular assignments clearly relate to wages, hours, and other terms and conditions of employment. Yet, they also are matters closely connected with educational policy, usually considered to be within the authority of the school board. This potential overlap of management functions with bargainable subjects leads to some rather fine line-drawing by labor boards as they attempt to strike a proper balance "between the duty of elected officials to make decisions for the entire electorate and the statutory right of employees to negotiate items directly affecting terms and conditions of employment." 71 *Mich. L. Rev.* at 919–920.

It must be borne in mind that in the matters at hand the Association is seeking nothing more than contractual interpretations which would, during the two-year term of the agreement, preclude unilateral uncompensated extension of the working hours of the four special education teachers and would require tuition reimbursement to Mr. Brodsky along with his placement on the M.A. + 30 level in the schedule of compensation. The interpretations would directly and most intimately affect the employment terms and conditions of the five individuals involved without affecting any major educational policies. Whether the interpretations sought by the Association would be proper ones in the light of the language used in the agreement between the Board and the Association would appear to be eminently suitable for arbitral determination in accordance with the terms of the agreement.

No issues of any substance under the school laws are presented and the expertise of the Commissioner of Education would not significantly further the interpretative process as to the intended meaning of the parties' agreement. We are satisfied that under the circumstances the Association acted within its contractual rights in pursuing the grievances

through arbitration without first submitting them to the Commissioner. We realize that administrative and judicial burdens may result from such case by case determinations but, pending further definitive legislation, we must continue the conscientious effort of giving effect to the provisions in our Education Law (Title 18A) without, however, frustrating the goals or terms of the Employer-Employee Relations Act (*N. J. S. A.* 34:13A-1 *et seq.*). *Cf. Clifton v. Passaic County Board of Taxation,* 28 *N. J.* 411, 421 (1958). In any event it is to be anticipated that the burdens will be minimal after a number of guideline opinions are handed down.

Reversed.

*For reversal*—Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD—5.

*For affirmance*—None.